UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | Cause No. 2:11-cr-00009-JMS-CMM |
| | ) | |
| CURTIS BILYOU, | ) -06 | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

The Defendant, Curtis Bilyou ("Mr. Bilyou"), by counsel, pursuant to 18 U.S.C. §

3582(c)(1)(A)(i), submits this Memorandum in support of the Motion for Compassionate Release

[Dkt. 146] filed by Mr. Bilyou herein, and respectfully requests an order reducing his sentence to

time served, or in the alternative, for a modification in sentence allowing him to serve the

remainder of his custodial term on home confinement.

    **I.**      **Procedural History.**

On February 24, 2012, Mr. Bilyou pled guilty to conspiracy to possess with intent to

distribute and to distribute 50 grams or more of methamphetamine (actual) and 500 grams or

more of methamphetamine (mixture) in violation of 21 U.S.C. §§ 841(a)(1) 846 and 851  [Dkt.

451].  His total sentence was for a term of imprisonment of 240 months followed by a term of

supervised release for a term of ten (10) years.  [Dkt. 451].  The Court recommended that the

BOP place Mr. Bilyou in a facility close to Terre Haute, Indiana so he could participate in the

Residential Drug Abuse Program ("RDAP").  [Dkt. 451].  He is currently serving his sentence at

FCI Oxford.  Mr. Bilyou has served 54% of his statutory term and is scheduled to be released on May 11, 2028.[1]

On June 9, 2020, Mr. Bilyou filed a *pro se* Emergency Motion for Release Pursuant to U.S.C. 3582 (c)(1)(A) Compassionate Release/Cares Act, citing his vulnerability to the coronavirus ("COVID-19") due to his severe obesity, asthma, fatty-liver disease, spots on his lungs caused by possible granulomatous disease, sleep apnea, chronic bronchitis, and sinusitis as an extraordinary and compelling reason for his release.  [Dkt. 881].  On June 10, 2020, the Court entered their Order Directing Filing of Notices Concerning Exhaustion of Administrative Remedies and Staying Case, ordering Mr. Bilyou to file a notice stating whether Mr. Bilyou had exhausted his administrative remedies. [Dkt. 882].  On June 24, 2020, Mr. Bilyou filed his Notice Concerning Exhaustion of Administrative Remedies.  [Dkt. 887].  On June 29, 2020, the Court entered its Order Appointing Indiana Federal Defender and Maintaining Proceedings and stayed the proceedings.  [Dkt. 891].  On July 2, 2020, the Court entered its Order Appointing CJA Counsel and appointed the undersigned to represent Mr. Bilyou.  [Dkt. 892].  Counsel filed his appearance on July 2, 2020.  [Dkt. 893].  On April 21, 2020, Mr. Bilyou sent his request for compassionate release to the warden of his facility.  [Dkt. 887-1].  The warden denied his request on May 20, 2020.  [Dkt. 887-1].

Mr. Bilyou asserts that COVID-19 in conjunction with his underlying health conditions—severe obesity, asthma, fatty-liver disease, spots on his lungs caused by possible granulomatous disease, sleep apnea, chronic bronchitis, and sinusitis —constitute "extraordinary and compelling circumstances" justifying his immediate release from FCI Oxford.  More than 30 days have passed since the warden denied his request for compassionate release and thus, he has exhausted

---

[1] *See attached* Exhibit A- Public Information Data.

his administrative remedies as required by 18 U.S.C. §3582(c)(1)(A) and is now seeking relief on the merits.

## II.      Legal Standard.

Under 18 U.S.C. § 3582 (c)(1)(A), the Court may "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portions of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable."  However, the Court may do so only "if it finds extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission  . . . ." 18 U.S.C. § 3582(c)(1)(A)(i).

Congress directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentencing reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  In response, the Sentencing Commission promulgated a policy statement regarding compassionate release under § 3582(c), contained in U.S.S.G. § 1B1.13 and the accompanying Application Notes.  While that particular policy statement has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release, courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. *E.g.,* United States v. Casey, 2019 WL 1987311, at *1 (W.D. Va. 2019); United States v. Gutierrez, 2019 WL 1472320, at *2 (D.N.M. 2019); United States v. Overcash, 2019 WL 1472104, at *2-3 (W.D.N.C. 2019). There is no reason to believe that the identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider.

As provided in § 1B1.13, consistent with the statutory directive in § 3582(c)(1)(A), the compassionate release analysis requires several findings. First, the Court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A), (3). Second, the Court must determine whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court must consider the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

Subsections (A)-(C) of Application Note 1 to § 1B1.13 identify three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious conditions from which a defendant is unlikely to recover and which "substantially diminish[]" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence, whichever is less; or (C) certain family circumstances. U.S.S.G. § 1B1.13, Application Note 1(A)-(C). Subsection (D) adds a catchall provision for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id. Application Note 1(D).

Recently, this Honorable Court held that it has the discretion to determine what qualifies as "extraordinary and compelling" under the catchall provision. *See* United States v. Critchlow, No. 2:15-cr-00006-JMS-CMM-01, dkt. 52 (S.D. Ind. Sept. 16, 2020). The Second Circuit recently held in United States v. Zullo, No. 19-3218-CR, 2020 WL 5739712, (2d Cir. Sept. 25, 2020) that district courts have **broad discretion** to determine what constitutes extraordinary and compelling circumstances for a reduction in sentence and the court is not limited to U.S.S.G. § 1B1.13 in making the determination. (emphasis added). The court reasoned that the First Step

4

Act freed district courts to consider any potentially extraordinary and compelling reasons that a defendant might raise for compassionate release and § 1B1.13, by its terms, applies only to BOP-initiated motions. The Southern District of Indiana has recognized that the BOP policy statement is in conflict between the circuits in <u>United States v. Smith</u>, No. 1:12-cr-00133-SEB-TAB, 2020 WL 5815045, (S.D. Ind. Sept. 29, 2020) when Judge Barker referred to this issue in a footnote.

If Mr. Bilyou qualifies for compassionate release, he does so under the catchall provision. Alternatively, the Court may exercise broad discretion to determine what constitutes extraordinary and compelling reasons following the logic of the Second Circuit.

Finally, there is no viable dispute that Mr. Bilyou has not exhausted his remedies as required by 18 U.S.C. §3582(c). This Court now has jurisdiction to determine his motion for compassionate release.

### III.    Discussion.

The Court should order Mr. Bilyou to be released for extraordinary and compelling reasons based upon his medical conditions in conjunction with the spread of COVID-19. Specifically, Mr. Bilyou suggests that his severe obesity, asthma, severe kidney problems, and status as a former smoker put him at an extreme risk of becoming ill if he contracts COVID-19. Moreover, Mr. Bilyou asserts that he is not a danger to the community, and that the 18 U.S.C. § 3553(a) factors do not outweigh the extraordinary and compelling reasons justifying his release.

### A.  Extraordinary and Compelling Reasons.

The COVID-19 pandemic is a serious public health crisis affecting every aspect of society.  Most courts have concluded that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."  <u>United States v. Kelley Kelly</u>, No. 2:13-cr-00016-JMS-CMM, dkt. 693

(S.D. Ind. October 20, 2020).  However, many courts have found that a prisoner may show an "extraordinary and compelling reason" warranting a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) by demonstrating that he is at an increased risk of severe illness from COVID-19 due to preexisting chronic medical conditions."  Id.

The Sentencing Commission has provided that one circumstance that could establish "extraordinary and compelling reasons" for compassionate release exist when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  USSG § 1B1.13, Comment 1.

### 1. Severe Obesity.

Mr. Bilyou is obese and weighs 280 pounds and has a BMI of 40.[2]  Obesity places Mr. Bilyou at high risk of experiencing serious complications if he contracts COVID-19.[3]  The United States frequently concedes that having a CDC-identified COVID-19 risk factor satisfies the "extraordinary and compelling" prong of § 3582(c)(1)(A)(i), even when the defendant is not limited in providing self-care and, thus does not qualify under subsection (A).[4]

Mr. Bilyou is unable to take appropriate steps to provide self-care for his obesity while incarcerated.  Mr. Bilyou spends most of his time sitting in the open dorm and is not allowed to adequately exercise because inmates are required to stay in their unit to prevent the spread of

---

[2] See attached Exhibit B – 2020 Medical Records, p. 13.
[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[4] See, e.g., United States v. Finan, No. 1:17-cr-87-TWP-MJD-1, dkt. 145 at 13 (S.D. Ind. June 23, 2020)("Therefore, because [the defendant] has established that he has a CDC-identified COVID-19 risk factor, the government does not contest that he has satisfied the 'extraordinary and compelling reason' prong of section 3582(c)(1)(A)(i)."); United States v. Elmer, No. 1:17-cr-113-JRS-TAB, dkt. 247 at 7 (S.D. Ind. June 17, 2020)("[The defendant's diabetes, during the COVID-19 pandemic, presents an extraordinary and compelling reason allowing for compassionate release."); United States v. Sanders, No. 3:06-cr-23-RLY-WGH-1, dkt. 31 at 6 (S.D. Ind. Oct. 26, 2020)("The government concedes that the defendant has presented 'extraordinary and compelling circumstances,' in that he has at least one condition that puts him at an increased risk of severe illness from COVID-19 . . . . Specifically, he is obese.").

COVID-19.  Further, the BOP does not provide Mr. Bilyou with a diet that promotes healthy living.  Most of the food the BOP offers at FCI Oxford—the exact types of foods that are harmful to Mr. Bilyou.  The food the BOP provides for those incarcerated lacks the nutritional value needed for proper weight control.  Additionally, Mr. Bilyou may purchase items from commissary; however, the items offered provide no better options.[5]  Further, even if healthier options were available for purchase, Mr. Bilyou lacks the storage space for such items.

In <u>United States v. Kirschner</u>, 2020 WL 4004059, at *2 (S.D. Ind. Jul 15, 2020), Judge Hanlon granted Mr. Kirschner's motion for sentence reduction because he suffered from chronic obstructive pulmonary disease, hypertension, and obesity. <u>Id.</u> Mr. Kirschner pled guilty to conspiracy to advertise child pornography and conspiracy to distribute child pornography. <u>Id.</u> Mr. Kirschner served most of his 124-month sentence and was released seven months before his scheduled release date. <u>Id.</u>

The Court found that Mr. Kirschner exhibited extraordinary and compelling reasons warranting a sentence reduction because of his "combined underlying health conditions, the CDC guidelines regarding individuals at an increased risk of severe illness from COVID-19, the conditions at FCI Milan, and because Mr. Kirschner had served 84% of his sentence. . . ." <u>Id.</u> at *3. The Court also based its findings on CDC guidelines which, in relevant part, states that an obese individual who has a BMI of more than 30 is at an increased risk of severe illness from COVID-19.[6]

In <u>United States v. Black</u>, 2020 WL 4583056, at *1 (S.D. Ind. Aug. 10, 2020),  Judge Pratt granted Mr. Black's Motion for Compassionate Release. Mr. Black was convicted for felon in possession of firearm, possession with the intent to distribute a mixture or substance containing

---

[5] *See attached* Exhibit C – FCI Oxford Commissary Order Form.
[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

marijuana and cocaine, and for possession of firearms during in relation to a drug trafficking crime. Id. At the time Mr. Black petitioned the Court for a reduction in his sentence, Mr. Black had served almost 75% of his sentence and was nearly two years away from eligibility for home confinement. Id. at *5.

In its response to Mr. Black's Motion, the government argued that Mr. Black's medical conditions were not severe because his conditions did not place him at an increased risk to COVID-19. Id. at *2. He suffered from asthma, diabetes, and obesity. Id. The Court concluded that because Mr. Black suffered from asthma, diabetes, and obesity, all risk factors for severe illness from COVID-19, "Mr. Black [had] demonstrated that extraordinary and compelling reasons exist to support a sentence reduction." Id. at *3. Additionally, the Court reasoned that Mr. Black's health issues were recognized in the CDC guidelines as illnesses that required extra precautions because individuals who are obese are at a higher risk of severe illness from COVID-19. Id.

In United States v. Jones, No. 1:07-cr-00167-JMS-KPF-01, dkt. 98 (S.D. Ind. Nov. 13, 2020), this honorable Court granted Mr. Jones' Motion for Compassionate Release. Mr. Jones pled guilty to distributing cocaine base and for carrying a firearm during and in relation to a drug trafficking crime. Mr. Jones had served 60% of his sentence and was nearly nine years away from his scheduled release date. Id. Mr. Jones suffered from obesity. The court concluded that Mr. Jones was at an increased risk of experiencing severe symptoms if he contracted COVID-19 "largely because he cannot undertake appropriate measures to protect himself." Id. at *8. Additionally, the court recognized that obesity is a CDC-identified COVID-19 risk factor that would place Mr. Jones at severe risk of illness. Id.

In this case, the Court should consider the guidelines—just as the court did in <u>Kirschner</u>, <u>Black</u>, and <u>Jones</u>—and find that Mr. Bilyou's obesity is one condition identified by the CDC as creating an increased risk of severe illness if he were to contract COVID-19.  Additionally, this Court should consider the many government concessions regarding "extraordinary and compelling reasons" as it relates to having a CDC-identified COVID-19 risk factor, such as obesity.

Therefore, because of the rulings in <u>Kirschner</u>, <u>Black</u>, and <u>Jones</u>; the CDC guidelines; and concessions of the government recognizes for obese inmates, the Court should find that Mr. Bilyou's obesity establishes an extraordinary and compelling reason justifying release.

## 2.  Asthma

Mr. Bilyou also suffers from asthma and is prescribed an albuterol inhaler to control it.[7] Asthma has been identified as an underlying medical condition that might place an individual at an increased risk for severe illness from COVID-19.[8]  The CDC has explained that those with asthma are at an increased risk because "COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[9]  During the COVID-19 pandemic, many courts have granted compassionate release to defendants that only suffer from asthma.[10]

---

[7] *See attached* Exhibit D – 2016 Medical Records, p. 13, 48.
[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[9] Centers for Disease Control and Prevention,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.
[10] *See, e.g.*, <u>United States v. Gorai</u>, 2020 WL 1975372, at *3 (D.Nev., Apr. 24, 2020) (granting motion for reduction after finding "defendant's asthma falls squarely within the ambit of preexisting conditions that the CDC has unambiguously explained place him at greater risk of COVID-19"); <u>United States v. Norris</u>, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma: "[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence."); <u>United States v. Wen</u>, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting *possible* positive case at institution); <u>United States v. Tran</u>, 2020 WL 1820520 (C.D. Cal., Apr. 10, 2020) (granting reduction for defendant serving a 15 year sentence for Hobbs Act robbery and possession of a machine gun where defendant suffered from asthma since childhood and was housed in a facility

Although Mr. Bilyou's asthma is treated with an inhaler and currently is under control, this Court should still consider the increased risk to Mr. Bilyou if he were to contract COVID-19. In <u>Black</u>, 2020 WL 4583056 at *3, the court addressed the government's argument that, because Mr. Black's asthma was mild and under control, his risk was not severe enough to warrant a sentence reduction.  The court dismissed the government's argument and noted that "morbid obesity combined with even mild asthma constitutes extraordinary and compelling reasons for release."  <u>Id.</u>  *See also,* <u>United States v. Vanburen</u>, No. 2:13-cr-00016-JMS-CMM-8, dkt. 679 (S.D. Ind. Aug. 10, 2020)(where the Government conceded that obesity and mild asthma, combined with the risk of contracting COVID-19, constituted extraordinary and compelling circumstances).

Here, Mr. Bilyou suffers from obesity and from asthma.  Both are recognized by the CDC as increasing one's risk of severe illness if they were to contract COVID-19.  Just as the court recognized in <u>Black</u>, Mr. Bilyou's obesity coupled with his asthma constitutes a compelling and extraordinary reason for a sentence reduction.  Moreover, a study conducted found that "asthma and obesity are connected in COVID-19 patients, which means that obesity coupled with asthma puts a patient at a significantly higher risk."[11]

### 3.  Severe Kidney Problems.

Mr. Bilyou also suffers from ureteropelvic junction obstruction ("UPJ") which causes recurrent bladder infections and kidney stones.[12]  UPJ is a condition where part of the kidney is

---

with an active COVID-19 outbreak); <u>United States v. Echevarria</u>, 2020 WL 2113604 (D.Conn., May 4, 2020) granting reduction for 49-year old with history of asthma, though court noted other unidentified "chronic medical problems").

[11] *See attached* Exhibit E – "Asthma Associated with Longer Time on Ventilators for Younger COVID-19 Patients" Rush University Medical Center, May 15, 2020.

[12] *See attached* Exhibit B – 2020 Medical Records, p. 18.

blocked and the flow of urine is stopped.[13]  In 2014, Mr. Bilyou underwent surgery for this

condition.[14]  In 2020, Mr. Bilyou began experiencing recurrent bladder infections, which are

resistant to medication, and has developed kidney stones.[15]  Mr. Bilyou was scheduled for

surgery to treat his UPJ on October 19, 2020.[16]  Despite being in extreme pain, Mr. Bilyou

refused to undergo surgery on October 19, 2020 due to fear of conditions at FCI Oxford and the

spread of COVID-19, and not being able to take care of himself and being more susceptible to

the disease because he would be recovering during the pandemic.

        While COVID-19 is known as a respiratory infection, it can also cause long-term kidney

damage, possibly leading to a person needing dialysis.[17]  Indeed, the CDC has stated that those

individuals with chronic kidney disease are at an increased risk of severe illness from contracting

COVID-19.[18]  The  CDC has also stated that "having chronic kidney disease of any stage

increases your risk for severe illness from COVID-19."[19] Further, researchers at Northwestern

University recently revealed that the death rate for patients with acute kidney failure is about

50%.[20]  Dr. John Sperati, an expert in kidney health at Johns Hopkins University, is currently

researching the different ways COVID-19 could affect kidney health, including damaging kidney

cells, deprivation of oxygen to the kidney, destroying kidney tissue, and blood clots in the

---

[13] https://www.urologyhealth.org/urology-a-z/u/ureteropelvic-junction-(upj)-obstruction#:~:text=Ureteropelvic%20junction%20(UPJ)%20obstruction%20is,urine%20out%20of%20the%20kidney.
[14] Id.
[15] Id., p.44.
[16] *See attached* Exhibit F – Updated 2020 medical records, p. 5.
[17] Most Americans Unaware of COVID-19's Effect on the Kidneys.  AJMC. June 5, 2020. https://www.ajmc.com/view/most-americans-unaware-of-covid19s-effects-on-the-kidneys.
[18] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[19] Id.
[20] Robert Pried, *Kidney Failure Often a COVID-19 Complication*, Health Day Reporter, June 16, 2020 at https://www.webmd.com/lung/news/20200511/kidney-failure-often-a-covid-19-complication.

kidneys.[21] While it is unclear how exactly COVID-19 affects the kidneys, it is clear that COVID-19 does affect the kidneys in a negative way.

Mr. Bilyou already has severe problems with his kidneys.  If he contracts COVID-19, he is at an increased risk for further kidney damage.  He needs to have surgery to address his UBJ but is fearful of the conditions at FCI Oxford and that he will contract COVID-19.  Combined with his other medical conditions, this Court should find that Mr. Bilyou has demonstrated another "extraordinary and compelling" reason warranting a sentence reduction.

### 4. Former Smoker.

Mr. Bilyou was a smoker for 13 years.[22]  Being a current or former cigarette smoker increases your risk of severe illness from COVID-19.[23]  Courts across the country are recognizing that smokers, past or current, are at an increased risk of illness from COVID-19.[24]

In United States v. Critchlow, 2020 WL 5544043, at *1 (S.D. Ind. Sept. 16, 2020), this Honorable Court granted Mr. Critchlow's Motion for Compassionate Release.  Mr. Critchlow had two health conditions, obesity and being a former smoker, that placed him at an increased risk of serious illness from COVID-19.  Id.  The Court found the government's argument that Mr. Critchlow quit smoking in 2017 unpersuasive because the CDC guidelines include former

---

[21] Coronavirus: Kidney Damage Caused by COVID-19.  May 14, 2020.  Johns Hopkins University Research Hospital.  https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-kidney-damage-caused-by-covid19.

[22] See Attached Exhibit G – 2017 Medical Records, p. 1.

[23] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#smoking

[24] See, e.g., United States v. Andrade, No. CR 16-20751, 2020 WL 5505344, at *2 (E.D. Mich. Sept. 11, 2020); United States v. Khawaja, 2020 WL 5549123, at *2 (D.N.H. Sept. 16, 2020); United States v. Critchlow, 2020 WL 5544043, at *1 (S.D. Ind. Sept. 16, 2020); United States v. Ludwig, 2020 WL 4547347, at *2 (E.D. Cal. Aug. 6, 2020); United States v. Galaz, 2020 WL 4569125, at *1 (S.D. Cal. Aug. 7, 2020); United States v. Godinez, 2020 WL 4530743, at *1 (S.D. Cal. Aug. 6, 2020); United States v. Mueller, 2020 WL 3791548, at *1 (E.D. Pa. July 7, 2020); United States v. Danson, 2020 WL 3467887, at *2 (D.D.C. June 25, 2020); United States v. Van Cleave, 2020 WL 2800769 (W.D. Wash. May 29, 2020); United States v. Smith, 2020 WL 4345327, at *1 (W.D. Wash. July 29, 2020); United States v. Rich, 2020 WL 2949365, at *2 (D.N.H. June 3, 2020); United States v. Foster, 2020 WL 5876941, at *1 (D. Or. Oct. 2, 2020); United States v. Terraciano, 2020 WL 5878284, at *1 (E.D. Cal. Oct. 2, 2020).

smokers.  Id. at *2.  The Court also noted that studies suggest that "the risk of disease progression in those who currently or previously smoked cigarettes was nearly double that of non-smokers."  Id.  The Court held that Mr. Critchlow's obesity and former smoker status established an "extraordinary and compelling" reason that warranted a sentence reduction.  Id. at *4.

Here, Mr. Bilyou is a former smoker.  He smoked for 13 years prior to incarceration. When considered with Mr. Bilyou's obesity, asthma, and severe kidney issues, Mr. Bilyou's past smoking history just adds to his risk of severe illness if he contracts COVID-19. This Court should consider the CDC guidelines like in Critchlow, and find that Mr. Bilyou has demonstrated an "extraordinary and compelling" reason warranting a sentence reduction.

**5. BOP and FCI Oxford in a COVID-19 Era.**

The conditions at FCI Oxford also help establish the extraordinary and compelling reasons because of its staff's inability to control the spread of the pandemic.  According to the BOP website, FCI Oxford has had 598 inmates and 61 staff members contract COVID-19.[25] Currently, ten (10) inmate and nine (9) staff members are battling COVID-19 at FCI Oxford. This Court's concern for Mr. Bilyou's safety, as well as the other inmates and staff, should not be dissuaded by the lower number of reported COVID-19 cases compared to other federal facilities.

In Cotton v. United States, No. CR 16-20222-8, 2020 WL 3488752, at *1 (E.D. Mich. June 26, 2020, the court granted the defendant's compassionate release even though the facility where he was located, FCI Morgantown, had no reported cases of COVID-19.  No. CR 16-20222-8, 2020 WL 3488752, at * 4.  The court noted that the lack of confirmed cases was likely a result of a lack of testing than a lack of the virus' presence in the prison.  Id.

---

[25] BOP: COVID-19 Update.  www.bop.gov/coronavirus/ (last visited Nov. 17, 2020).

Moreover, in United States v. Brown, 2020 WL 5801494, *2 (E.D. PA Sept. 29, 2020), the court cited the lack of testing at FCI Fort Dix as a "risky deal-with-it-only-if-forced-to-strategy." In that case, the government argued that FCI Fort Dix "remains under control" and that, because there were "relatively few cases of the virus at FCI Fort Dix" it could be assumed that the preventative measures at the prison had been effective. Id. The court rejected that argument and further went on to state that it was "somewhat skeptical of the Government's confidence in BOP confinement efforts." Id. at *3. It noted that the BOP did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious and medical exemptions, as well as outright refusals to comply with the mask mandate. Id. The court further criticized BOP COVID-19 preventative measures by noting that BOP employees are permitted to continue working after potential exposure to COVID-19. Id. The court found that "in light of the history of confirmed cases of COVID-19 at FCI Fort Dix, and the BOP's protocols which did not include mass-testing of inmates or any testing of staff, there [was] more than a mere speculative risk of infection at Fort Dix." Id.

The same rationale from Brown should be applied here. Even though the COVID-19 numbers are lower than other facilities, that does not mean the facility has the pandemic under control. FCI Oxford operates under the same BOP procedures as did the facility in Brown.

While it is fortunate no one has died at FCI Oxford, there have been 141 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19.[26] The BOP is unable to manage this virus at the rate at which it is spreading. The BOP has 139,185 federal inmates around the country.[27] The BOP staff has approximately 36,000 members. Of those numbers, 21,208 federal inmates and 1,788 BOP staff members have confirmed positive test results for COVID-

---

[26] https://www.bop.gov/coronavirus/. Last accessed on November 17, 2020.
[27] https://www.bop.gov/coronavirus/ (Last accessed on November 17, 2020)

14

19 nationwide.[28]  The Washington Post has reported that both prisoners and guards do not feel safe inside the facilities.[29]  Federal workers have also began to demand hazard pay because of the risky conditions they are forced to work in.[30]

The conditions inside FCI Oxford are not amenable to proper sanitization.  For example, there are approximately 65 inmates that share six toilets, six showers, and six sinks in Mr. Bilyou's unit.  It is very unlikely that these bathroom surfaces are being properly sanitized to prevent the spread of COVID-19 after each use.  Further, this Honorable Court recognized that correctional facilities face particular challenges in controlling the spread of the virus.  United States v. Kelley Kelly, No. 2:13-cr-00016-JMS-CMM, dkt. 693 (S.D. Ind. October 20, 2020). Inside the facility, Mr. Bilyou cannot adequately protect himself and practice CDC recommended social distancing measures because he shares sleeping quarters and bathroom facilities with several other inmates.  "Social distancing" is nearly impossible to reduce transmission and flatten the curve of cases for inmates.[31]  Moreover, despite the BOP's mask-mandate, very few inmates and staff wear a mask.

Additionally, the CDC recently expanded its definition of what constitutes "close contact" with an individual with COVID-19.[32]  The CDC now defines a close contact as someone who was within six feet of an infected individual for a **total** of 15 minutes or more over a 24-hour period. In making the change, the CDC relied on a report from a Vermont prison where a 20-year-old prison employee who, in an eight hour shift, had 22 interactions—for a total of 17 minutes—with individuals who later tested positive for the virus.  The employee had multiple brief encounters

---

[28] Id.
[29] https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.
[30] Id.
[31] https://www.nejm.org/doi/full/10.1056/NEJMp2005687.
[32] CDC expand definition of who is a 'close contact' of an individual with covid-19.  Lena H. Sun, The Washington Post.  October 21, 2020.

with six prisoners while their coronavirus test results were pending.  Id.  The next day, all six individuals tested positive.  Id.  Caitlin Rivers, an epidemiologist at the Johns Hopkins Center for Health Society stated, "it's easy to accumulate 15 minutes in small increments when you spend all day together" and she expects "this will result in many more people being identified as close contacts."  Id.

Under the new CDC definition of "close contact," it will be nearly impossible for Mr. Bilyou to adequately protect himself from the dangers of COVID-19.  If he were released, Mr. Bilyou could practice safe social distancing at home.  Moreover, he would be able to properly sanitize the surfaces he comes into contact with and practice proper self-hygiene to prevent the spread of COVID-19 and flatten the curve.

Accordingly, this Court should find extraordinary and compelling reasons exist for a sentence reduction based upon Mr. Bilyou's medical conditions, including his obesity, asthma, and severe kidney problems, in conjunction with the BOP's poor handling of COVID-19 and specific conditions at FCI Oxford.

**B. Danger to Any Other Person or to the Community.**

Mr. Bilyou would not be a danger to the community, if released.  The relevant guidelines provide that a sentence reduction is appropriate only where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Section 3142(g) provides:

> (g) **Factors to be considered**.—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
>> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section

1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Mr. Bilyou pled guilty to conspiracy to possess with intent to distribute 50 grams or more of actual methamphetamine and 500 grams of methamphetamine mixture.[33]   Specifically, in January and February of 2011, Mr. Bilyou supplied methamphetamine to another person for distribution in Terre Haute, Indiana.[34]   Mr. Bilyou was sentenced to 240 months incarceration, followed by ten (10) years of supervised release.[35]   Mr. Bilyou has been incarcerated for nine and a half years, beginning on April 27, 2011.[36]   While Mr. Bilyou's offense conduct is serious, no minors or violence were involved.   Mr. Bilyou accepted responsibility for his conduct and assisted authorities in the prosecution of his own misconduct by entering a plea of guilty.[37]

---

[33] Dkt. 394.
[34] Id. at p.5.
[35] Dkt. 451.
[36] Dkt. 394 at p.4.
[37] Id. at p.7.

Almost ten years have passed since Mr. Bilyou's offense conduct and he is not the same man.  Mr. Bilyou is now 42 years old, an age at which the United States Sentencing Commission has found the likelihood of recidivism substantially declines. [38]  While incarcerated, Mr. Bilyou has participated and completed several programs offered at his facility.  He has earned his GED, completed the drug education course, and completed the financial responsibility course.[39]  Mr. Bilyou has also learned several trade skills while working in Unicor, including powder coating, operating a fork lift truck, how to read blueprints, spot welding, how to operate a brake press, and masonry.  Additionally, he has completed courses in Microsoft Word and Excel, as well as Spanish 1 and keyboarding.  He was approved to work in the food service department in 2019.  His current work detail is at the powerhouse camp.[40]  To be assigned to the powerhouse, he completed 2000 hours of apprenticeship work.  Mr. Bilyou has been classified as a medium risk of recidivism[41]; however, Mr. Bilyou asserts that in a meeting with his case manager in July 2020, she told Mr. Bilyou that he was actually a low-level risk and would work to get him reclassified.[42]

During his almost ten years of incarceration, Mr. Bilyou has only had one disciplinary infraction for refusing to obey an order.[43]  In Jones, No. 1:07-cr-00167-JMS-KPF-01, dkt. 98 at *11, the court described the defendant's behavior as "exemplary," even though the defendant had received three disciplinary infractions during his thirteen years of incarceration.  Mr. Bilyou's one disciplinary action should not deem him a danger to the community, but rather his behavior has been exemplary while incarcerated.  Joshua Fish, Mr. Bilyou's work supervisor at UNICOR,

---

[38] *See* Kim Steven Hunt & Billy Easley II, U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, 22 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2017/20171207_Recidivism-Age.pdf
[39] *See attached* Exhibit H – Inmate Profile.
[40] Id.
[41] Id.
[42] The Inmate Profile is dated July 28, 2020 and still has Mr. Bilyou classified as a medium risk recidivism level.  At the date of filing, it is unclear whether Mr. Bilyou has since been reclassified as a low risk recidivism level.
[43] *See attached* Exhibit I – Inmate Discipline Data.

describes Mr. Bilyou as a "hard worker,"  as having "shown initiative," and as having "made important, work related decisions for the good of the company."[44]  Mr. Fish describes Mr. Bilyou as remorseful for his crimes and speaks highly of his desire and commitment to not reoffend. Finally, Mr. Fish asserts that Mr. Bilyou will be an "asset" to society because of his support group and commitment to be a productive member of society.[45]

If released, Mr. Bilyou has secured employment with Lucas Construction located at 2671 East Dallas Drive, Terre Haute, Indiana.  Mr. Bilyou will reside with his cousin, Angie Sears in Terre Haute, Indiana.  Mr. Bilyou has family and friends that will be his support group and help him transition back into society.  Mr. Bilyou has resided in Terre Haute, Indiana his whole life and he has two sisters, as well as one 20 year old daughter, who all reside in Terre Haute.[46]  During his incarceration, Mr. Bilyou's parents died.  Upon release, Mr. Bilyou will attend NA/AA classes to maintain sobriety.

The government will likely focus on Mr. Bilyou's behavior at the time of his arrest and his single disciplinary action.  However, those facts are not dispositive and this Court should focus on the individual Mr. Bilyou is today and not the person he was ten years ago.

In Black, 2020 WL 4583056 at *4, Mr. Black was on parole for dealing cocaine and obtained two semiautomatic handguns that he carried while he continued to deal drugs.  Mr. Black had a significant criminal history for burglary, carrying a handgun without a license, attempted burglary, felony resisting law enforcement, and dealing in cocaine.  Id.  The court held that "while the court is concerned about Mr. Black's criminal history, it finds that adding the requirement that the first year of Mr. Black's supervised released be under conditions of home detention with GPS

---

[44] Dkt. 887 at p.7.
[45] Id.
[46] Dkt. 394 at p.10.

monitoring will alleviate potential threats to the safety of the general public." Moreover, the court in <u>Black</u> was persuaded that the defendant was not a danger to the community by his well-established reentry plan (stable housing and a job) and support of family and friends. Mr. Black was sentenced to 180 months of incarceration followed by five years of supervised release. He had served 75% of his sentence.

In <u>Jones</u>, No. 1:07-cr-00167-JMS-KPF-01 at *1, Mr. Jones sold drugs and guns to an undercover Indianapolis Metropolitan Police Department officer. The court recognized the significant amount of controlled substances and firearms involved in Mr. Jones' conviction, but held that his release from incarceration to a ten-year term of supervised released would not pose a danger to the community. <u>Id.</u> at *11. The court noted Mr. Jones accomplishments while incarcerated, including being an inmate worker, completing several education courses, and earning his GED. <u>Id.</u> Mr. Jones was sentenced to 300 months of incarceration and followed by ten years of supervised release. He had served 60% of his sentence.

Here, Mr. Bilyou is arguably less dangerous than the defendants in <u>Black</u> and <u>Jones</u>. Mr. Bilyou did not possess a firearm during his offense conduct. Similarly to the defendant in <u>Black</u>, Mr. Bilyou has a well-established reentry plan—stable housing and a job—and support of his friends and family. Also, just as the defendant in <u>Jones</u>, Mr. Bilyou is an inmate worker, with outstanding reviews from his supervisor, has completed several courses while incarcerated, and has earned his GED.

This Court should find that Mr. Bilyou no longer presents a danger to the community after considering his personal characteristics, his rehabilitation efforts during his nearly ten years of incarceration, and his well-established re-entry plans.

20

### C.  Section 3553(a) Factors

The section 3553(a) factors favor Mr. Bilyou's early release because they do not

outweigh the "extraordinary and compelling reasons" warranting a sentence reduction. Section

3553(a) provides:

a) Factors to be considered in imposing a sentence.—The court shall impose a
sentence sufficient, but not greater than necessary, to comply with the purposes
set forth in paragraph (2) of this subsection. The court, in determining the
particular sentence to be imposed, shall consider—

   (1) the nature and circumstances of the offense and the history and
   characteristics of the defendant;

   (2) the need for the sentence imposed—
      (A) to reflect the seriousness of the offense, to promote respect for the
      law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed educational or vocational
      training, medical care, or other correctional treatment in the most
      effective manner;

   (3) the kinds of sentences available;

   (4)  the kinds of sentence[s] and the sentencing range established for—
      (A) the applicable category of offense committed by the applicable
      category of defendant as set forth in the guidelines [issued by the
      Sentencing Commission . . . ;]

   (5) any pertinent policy statement guidelines [issued by the Sentencing
   Commission . . . ;]

   (6) the need to avoid unwarranted sentence disparities among defendants
   with similar records who have been found guilty of similar conduct;
   and,

   (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The nature and circumstances of Mr. Bilyou's offenses are certainly serious—drug

trafficking affects the community as a whole.  In Mr. Bilyou's case, no violence occurred during

21

the commission of his offenses.  Mr. Bilyou has been incarcerated for nearly ten years.  He has

served 54% of his sentence of imprisonment.  The almost ten years he has spent in prison reflects

the seriousness of his crimes and represents a severe punishment.  Mr. Bilyou has had nearly

exemplary behavior while incarcerated and has used his time to better his life by completing

several educational courses and earning his GED.  He will continue to have exemplary behavior

upon release and will be in strict compliance with any conditions this court imposes upon his

release.

The Supreme Court has said that post-sentencing conduct is "plainly relevant to the

history and characteristics of the defendant"; pertinent to the need for the sentence imposed"; and

may "critically inform a sentencing judge's overarching duty to under § 3553(a) to "impose a

sentence, but not greater than necessary, to comply with the sentencing purposes set forth in §

3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011). Further, in a recent case from

this Honorable Court, Judge Young determined "when considering a motion for sentence

reduction, the Court can consider "new statutory minimum and maximum penalties; current

Guidelines; post-sentencing conduct; and other relevant information about a defendant's history

and conduct." *United States v. Camp*, Case No. 3:06-cr-00012-RLY-WGH, E.C.F. 16 at 9 (S.D.

Ind. Aug 10, 2020) (citing *United States v. Hudson*, 2020 WL 419833 (7th Cir. July 22,

2020)(quotation omitted)).

With the combined serious risk of illness to Mr. Bilyou from the COVID-19 pandemic

and his post-sentencing conduct, the factors weigh in favor of reducing his sentence to time

served.  *See* United States v. Ebbers, No. S402-CR-11443VEC, 2020 WL 91399, at *7 (S.D.N.Y.

Jan. 8, 2020) (in evaluating a motion for compassionate release, the court should consider

whether the § 3553(a) factors outweigh the "extraordinary and compelling reasons" warranting

compassionate release, and whether compassionate release would undermine the goals of the original sentence).  The unprecedented COVID-19 pandemic changes the sentencing calculus and affects the court's present-day balancing of the sentencing factors.

Again, Mr. Bilyou has served 54% of his sentence.  However, a focus on the quantity of custodial time remaining in Mr. Bilyou's sentence would be misplaced.  This ignores the real issue:  the substantially increased severity of the punishment Mr. Bilyou has already endured since the COVID-19 pandemic began and, absent compassionate release, will continue to experience, especially if he contracts COVID-19.  Due to the BOP's response to COVID-19, inmates spend a majority of their time in lock-down status with no visitation allowed.  Educational programming has ceased.  When combined with the added daily stressor of potentially contracting a life-threatening illness, Mr. Bilyou's time in custody has been substantially more punitive than a similar term of incarceration in pre-pandemic conditions.

Courts now recognize that "the factor relating to the 'need for just punishment' has dramatically shifted" during the COVID-19 pandemic.  United States v. Indarte, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020).  "High-risk defendants living in fear during a COVID-19 outbreak in their facility experience an incarceration significantly more laborious than before COVID-19.  The laborious nature of this incarceration causes the § 3553(a) factors to favor release before the defendant has served his or her full sentence."  United States v. Little, 2020 WL 2613034, at *2 (N.D. Ohio May 23, 2020); see also United States v. Zukerman, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020)(acknowledging the "seriousness and duration of [the individual's] criminal conduct," but noting "the environment where [the individual] is serving his sentence" changes things).  Mr. Bilyou's continued detention now puts him in imminent

danger of serious illness or death—a circumstance that the Court would have never considered when imposing his sentence in 2011.

Mr. Bilyou is very is obese, has asthma, has severe kidney problems, and is a former smoker.  Additionally, he needs surgery for his kidneys, but is terrified to move forward with the surgery while in BOP custody.  Upon release, Mr. Bilyou will take control of his health by participating in daily physical activity and making healthy dietary choices, as well as proceeding with his needed surgery.  This will deter Mr. Bilyou from reoffending.  *See e.g.*, <u>United States v. Grubbs</u>, No. CR-16-228 (W.D. Wash. July 8, 2020)( releasing inmate guilty of receipt of child pornography who had served 33 months of 108 month sentence. Gov't opposed on concerns of global community safety, lack of remorse, poor attitude, and ease of reoffending. The Court acknowledged the government's concerns, but cited potentially dire consequences to defendant's health if he violates conditions of supervised release to motivate compliance and cooperation). Mr. Bilyou is highly concerned about his health and the current ongoing pandemic—this will motivate his compliance and cooperation with any conditions this Court imposes on his release.

Further, conditions in a prison during the COVID-19 pandemic are a consideration for a court when granting relief.  *See, e.g.,* <u>United States v. Olawoya</u>, No. 1:15-CR-00172-AA-5, 2020 WL 455916 at *5 (D. Or. Aug. 7, 2020) ("The sentence the defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing."). Prison sentences have two dimensions: length and harshness. Courts recognize that as conditions get harsher, sentences should get shorter. *See e.g.,* <u>United States v. Spano,</u> 476 F.3d 476, 479 (7th Cir. 2007) (finding merit to the argument that "the harsher the conditions the shorter the sentence should be.").

In <u>United States v. Armstrong</u>, the court noted its awareness that defendants committing similar offenses to the defendant (drug trafficking incidents), in the time of COVID-19, were receiving vastly lower sentencing recommendations, because their time in custody is harsher and those with pre-existing conditions, like diabetes, were receiving particularly favorable recommendations.  <u>United States v. Armstrong</u>, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020).

Moreover, the heightened risk that COVID-19 presents to vulnerable inmates with underlying medical condition also alters what should be considered "just punishment" for an offense. 18 U.S.C. § 3553(a)(2)(A).  Congress and the Sentencing Commission could not have predicted the COVID-19 outbreak or the current conditions of confinement, where inmates are not only on lockdown and deprived of exercise, social visits, and programming meant to aid their rehabilitating, but also at an increased risk of falling ill with COVID-19. Unreasonable exposure to a deadly contagion has been held to violate the Eighth Amendment's prohibition against cruel and unusual punishment. <u>Helling v. McKinney,</u> 509 U.S. 25, 28 (1993); *see also* <u>Wallis v. Baldwin</u>, 70 F.3d 1074 (9th Cir. 1995) (applying <u>Helling</u> to exposure to asbestos); <u>Brown v. Mitchell</u>, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying <u>Helling</u> to "contagious diseases caused by overcrowding conditions").

Mr. Bilyou has been battling obesity, asthma, severe kidney problems, and a global pandemic while incarcerated.  Just like the defendant in <u>Armstrong</u>, Mr. Bilyou's time in custody has been harsh.  As such, this court should recognize those harsh conditions and shorten Mr. Bilyou's sentence.  Mr. Bilyou's sentence is much harsher than what could have been contemplated at sentencing.  Because of Mr. Bilyou's deteriorating health, further incarceration

is not needed.  He has suffered from illness for the majority of his sentence and further incarceration would be greater than necessary to serve the purpose of punishment.

Releasing Mr. Bilyou to a reduced sentence of time served and ordering him to serve his term of supervised release for ten years or, alternatively, releasing him to serve the remainder of his custodial term on home confinement, will still impose a sanction and general deterrent that recognizes the seriousness of his conduct.  In addition to the time Mr. Bilyou has already served, he is still sentenced to 10 years of supervised release. Supervised release is an adequate deterrence to future criminal conduct because Mr. Bilyou does not wish to return to incarceration.

Additionally, Mr. Bilyou can better socially distance and quarantine himself outside of the prison setting.  The CDC has recognized that correctional facilities face particular challenges in controlling the spread of the virus.  United States v. Kelley Kelly, No. 2:13-cr-00016-JMS-CMM, dkt. 693 (S.D. Ind. October 20, 2020).  Upon release, Mr. Bilyou will reside with his cousin and properly perform self-care for his medical issues by exercising and eating healthier foods and seeing the proper specialists.

For the reasons stated above, the Court should conclude that the applicable § 3553(a) factors support Mr. Bilyou's request for a sentence reduction.

## IV.    Conclusion.

Mr. Bilyou has demonstrated extraordinary and compelling reasons for compassionate release under 18 U.S.C. § 3582(c) to warrant a reduction of his sentence. He does not pose a danger to any other person or the community under the conditions of his release and the § 3553(a) factors support a reduction, and that the reduction is consistent with the Sentencing Commission's policy statements.

Respectfully submitted,

**TATUM LAW GROUP, LLC**

*/s/ Finis Tatum IV*

Finis Tatum IV
*Attorney for Curtis Bilyou*
845 South Meridian Street
Indianapolis, Indiana 46225
Phone: (317) 636-7180
Fax: (317) 638-3474
Email: ftatum@tlgindy.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and complete copy of the foregoing was served upon counsel of record, by electronic means on this 19th day of November, 2020. Parties may access this filing through the Court's system.

*/s/ Finis Tatum*

Finis Tatum IV
*Attorney for Curtis Bilyou*
845 South Meridian Street
Indianapolis, Indiana 46225
Phone: (317) 636-7180
Fax: (317) 638-3474
Email: ftatum@tlgindy.com